I want to welcome everyone to the Four Circuit Court of Appeals this morning and to this magnificent courtroom. We look forward to four interesting cases with a group of outstanding lawyers. And with that said, we'll call the first case, which is United States v. Treisman, Mr. Blau. Yes, sir, your honor. Good to have you with us, sir. Thank you, your honor. Good morning. May it please the court. My name is Dan Blau. I'm with the Blau Law Firm in Raleigh. It's a pleasure to be with the court this morning to speak with you about Alex Treisman. Your honors, police frequently come into contact with vehicles that might be considered abandoned under local ordinances. But that does not mean that the officers can then in turn abandon the Fourth Amendment vehicles. But the officers in this case did just that. They committed two separate Fourth Amendment violations related to Mr. Treisman's van. First, they entered and searched his van without a warrant in order to address a medical emergency that did not exist. Second, they impounded and inventoried his van without complying with their internal regulations and local code as a pretext to search for evidence of crime. And for either or both of those reasons, this court should reverse the district court's order denying Mr. Treisman's motion to suppress. I'll first take up the initial entry into the van, which was due to this purported medical emergency. We're dealing here with the emergency doctrine, which is an exception to the warrant requirements. It allows police to make entry into a particular area to render aid to someone who's experiencing a medical emergency. What do you make of the fact that emergency is a vehicle when almost all of our case concerns have been about the home, which is different? But don't we have some unique facts here? We've got an abandoned vehicle on private property with evidence that someone was living in this van. They come upon it and it's rather unusual that this air-conditioned unit, as I understand it, is a van that's sitting out in a parking lot and it looks like someone lives in it and it's just there? Well, Your Honor, here's what I believe would have been prudent, and I think this is a situation that we could all put ourselves in. We've probably been in this situation many times in our lives. Say you're at a restaurant and you come to a bathroom door and you don't know if anybody's there. You don't just open the door and go in. What do we do? Hi, anyone in there? And you knock and you try to figure out if someone is there. Here you have to add a couple of additional facts, too. It's a bank parking lot. Yes, sir. It apparently was there in the morning when the bank opened. If you looked in the front window of the van, there's some heavy-duty guns in there. Yes, sir. Including an AK-47 or AR-15 or something. An assault rifle. Right. And you can't see in the back. Go ahead. Well, I think there are two separate issues. The first one issue, which is kind of the second Fourth Amendment issue in the case, is whether the police could impound and inventory the van to deal with the situation of the firearms being in it. I think this ties in with the medical emergency, too. You brought up this bathroom business, but this is not a restroom. Right. And you go knock on the door. This is a van that looks like someone lives in it. You look in it and you see these assault weapons in plain view. And you have to believe no one has left a vehicle out in the middle of a parking lot like this with plain view weapons in it unless they're in it. I mean, you would think someone is in this van because you don't just leave that out in a I guess that was a part of it. It's not part of this, but it's a strange situation at the very least, isn't it? Well, I think what's strange, Your plates on it. I'm sorry? And that California license plate. Yes, sir. And it's what's in the Fifth Third Bank lot at Kannapolis North Carolina. Yes, sir. And they had trouble running it down. Right. In the records. Well, I mean, and Judge Osteen, an able and experienced fellow, gave you a two or three day hearing on this thing. Yes, sir. And let's be sure you said no one called out, but that back door was a job, wasn't it? Well, if your eyes open it and they called out to see if anyone. Well, let's look to see what they testified. Yes, sir. If if your honors have the joint appendix in front of you on page thirty five, you can see a good picture of what this ajar door actually looked like. And it is from the picture in the joint appendix. This was from the government's response to the motion to suppress. It is not apparent at all that that that door was ajar. Now, Judge Osteen did credit the officer's testimony that perhaps the strips didn't line up correctly and they thought there might have been an issue there. But he credited the officers all the officers evidence. So he accepted what they said. Well, he accepted it. But of course, when we apply the test for the emergency doctor, and the question is not what the officer's subjective intentions are, but what is this like a sub part of the emergency doctor? Well, they call it the community caretaker. Well, that's a step that is separate and apart. That is separate to it. Well, this court has said they may have similar underpinnings, but they are different. The fourth, the community caretaking exception comes into play when officers are encountering vehicles that have been in accidents or blocking traffic or things of that nature. This court says that we need to apply a different test when we're dealing with a medical emergency situation, because that's actually falling under the exigent. They didn't know it was a medical emergency situation. They thought it could be. Exactly. And if we look. It could be someone in there asleep or dead. Judge Osteen said that. Exactly. And your honor, if we look at. No. If we look. Exactly. We don't know. And if we look. I mean, this is a pretty classic example, I think, of officers being reasonable. I think this court's test is significantly higher than than what your honor has just described. It has to be reasonable. That's what the Fourth Amendment says. Yes, sir. If you look at the Moss case, the Moss case from this court says that officers need to have evidence that an emergency existed that required immediate entry. So not just that it's possible in my counsel, don't we? I mean, we're just kind of talking about these facts as if we're looking at this case to know a little bit. And it seems to me it's important that we're reviewing the denial of a motion to suppress. Right. And in that circumstance, what we do is we look and see if there's clear error in the district court's factual. Right. And we construe the evidence in the light most favorable to the government. Right. And then we see if effectively the not just that could have come down differently, but that the record compels the opposite result. And and and I can I can appreciate some good arguments that I saw you made below and made your briefs that maybe this wasn't objectively reasonable. But the district court listed seven or eight facts in the record. So one like it was not factual support. So how do you deal with even if even if I accept that you could look at this two different ways, maybe it's objectively reasonable, maybe it's not. Doesn't our standard review put us in a situation where we just really need to see if there's facts that support this conclusion from the district court? Well, and I don't know that the facts are in great dispute in this case. There doesn't seem to be a whole lot of difference between ourselves and the government about what actually happened. But this court can certainly reviews de novo the district court's conclusion about whether those facts created a reasonable belief that an emergency existed and that immediate entry was required. That sums up your position here. Just what you just said that the judge was wrong. Yes, sir. That if you that if you consider the facts that the court found, you still arrive at the conclusion that an emergent there was not sufficient evidence that an emergency existed that required immediate entry. If we look at the mosque case where the court sets out that test, this is the case where an officer comes upon a car that's parked on a service road in front of a cabin and is blocking traffic. And the officer thinks, well, that's unusual. Someone is, you know, maybe inside this cabin. They may need medical assistance because they've left the car parked to skew. And the officer goes inside the cabin to render assistance to someone that possibly could be inside. But as your honor indicated, as in this case, we don't know. Speak to the second issue. The second question, whether the impounding justified that you state in your reply brief that you do not necessarily dispute the officer's decision. Yes, sir. As to whether it was reasonable in the circus, but you take issues with how the officers conducted the search. Well, I think we take issue with a few things, your honor. Officers decision to impound. You don't take issue with that. Well, we have an impound and then we have an inventory. Those, I think, are two separate Fourth Amendment incidents. And when we look at that, we have to do an inventory when they impound. They go together. They do not have to do an inventory when they impound. In fact, I think one of the troubling things in this case is that under the police guidelines, it gives them no criteria to exercise their discretion to determine whether to inventory. It says you may, but it doesn't require it. And that means that police officers could do it for any reason or for no reason, including for improper reasons. What did they find in plain view? Tell me about those weapons. What was the weapons and stuff they saw when they looked in this van? Right. It's been sitting in a parking lot for how long? Well, at least since the prior afternoon. So how long? A day? I don't think it was a day yet at that point, but it was 12 to 18 hours. Has a right air conditioning unit on it. Looks like somebody could live there. Looks like it could be. Right. And you look in it. And what are those weapons that they saw in there? Well, there's a rifle and there's a, there's a, I think a handgun case. There's an AR-15. Right. A rifle. Yes, sir. Assault rifle. But in the, when they go in the back, I think that's what I thought the question was. Oh, I'm sorry. Yeah, there's additional weapons there. Right. And we contend that the, you know, secondary violation occurs before they go into the back. Were there weapons, more weapons than the AR-15 visible in the front? There was an AR-15. There was a case for a handgun. They didn't know if it contained a handgun or not. There's also what is a Tannerite, which is something that's used on a shooting range that kind of makes an explosion. And I guess it was bomb-making material. And wasn't there ammunition? There may have been a, yes, a box of ammunition visible in the front. I can see all that from the outside. And it's not, and just to be clear, it's not our contention that the officers couldn't do something about this. The issue is that when the officers decide to act, you have to look to see if the primary motivation is an impound and inventory under their code, or if they have a motivation to look for evidence of crime. And here is where, even though perhaps they could have done a lawful impound, you have to look at how they actually did that to understand what their motivations are. And here we have a... It doesn't seem to follow right now. You see this vehicle out here, and you look in there, even before you go in the back, you see this AR-style firearm, ammunition, I think, some other items that are in plain view. What's this Tannerite? What's that? This is, and this is not my area of expertise, Your Honor. That's the bomb-making material. Well, it was described in different ways, but I think the parties agree that it's something that is used on shooting ranges, where a person can shoot it, and it makes an explosion. So it's, I guess, people who shoot at ranges may... I mean, that's the legitimate use of it, but you could have some other use of it, too. I think anything can happen. It was set in a bank parking lot. We haven't emphasized that either. It's outside the bank. Well, and again, I... It's right outside the bank, and the bank people are the ones that called the police. I don't disagree with anything the court's saying. That's what we're getting at, is that if you don't disagree with what we're saying, you've got a vehicle out there with all these weapons in it, you've got Tannerite in it, and you're saying these officers can impound this vehicle. You don't question that decision. It's the inventor. They can't look in this vehicle and see what's in it with this California plates in a parking lot? Your Honors, you have to look at how they actually did this in order to see what their true motivations are. They tried to call the owner several times. They could not locate the owner of it. They didn't just go in, pull it in, and start looking. They made some efforts to try to locate that owner. They went back and forth with the private property owner of the bank several times, asking, what do you want to do? What do you want to do? Well, he made it clear he didn't want this thing on his property at the time, but that's not dispositive. All these facts are here, and it just seems like there are a lot of things we let officers do, but this looks like one of the things that ought to be pretty easy in terms of deciding. Well, there are easy things, Your Honor. It's specified in their own regulations and in the city ordinance how they're supposed to deal with these situations, and those regulations and ordinances say— We aren't bound by those, though, are we, Warren? We aren't. We're reviewing it under the Fourth Amendment. Well, that's true, but one of the— That's a question of what they did was reasonable. But this Court has said, and this is from the Brown case, when we look at when an impound and inventory has to be reasonable, one of the factors that this Court has instructed us to consider is whether the police have lawful custody of the vehicle and whether it's conducted pursuant to standard policy. So that is something that we have to look at here. It's not just about whether, in theory, they could impound it. Part of the reasonableness— They had a policy that allows the inventory, and it— I mean, you quarrel that it's not specific enough, but it really doesn't say you've got to do it 1, 2, 3, 4, 5. You know, I know you have an argument that they should have been more— could have done it better, could have listed out the guns separately or the cash, but, you know, they also— You know, they didn't seize the potentially criminal evidence. They didn't do things that you would do if you were really conducting a criminal investigation, or at least that's what the District Court found. So, once again, you've got some facts that might support your position. You've got some facts that go the other way. Well, they took all the guns out and ran the serial numbers, and that kind of only tells you one thing. But I think the bigger problem here is that when we have a van on private property, there's a greater potential for abuse of the ability to impound an inventory— They're on the bank property. They're right next door to the bank. Yes, sir. With an AK-47 or an AR-15. Yes. And ammunition and explosive material. Yes, sir. That's the very exigent circumstances. But he didn't talk about that, but, you know, I think— I'm surprised they waited as long as they did before they went into it. And their city— There were some limitations here. I mean, the court didn't find this to be pretentious. Once they searched this area and saw the cash, they wouldn't have got a warrant. They didn't just keep on with an inventory search for the rest of the items that were in there, like the bomb-making books and all that kind of stuff, or the Trishman—or his IDs, anything like that. They didn't get that to have to get a warrant, did they? No, but we contend the violations had already occurred at that point. See, my time is up. They did get a warrant. Eventually. And they got another warrant for his cell phone. Eventually. Based on— Right. There are two search warrants that ultimately— But you're making—you're trying to suppress this to help him with his conviction. Well, we contend that the warrants they ultimately got, the information in there was all fruits of the 2nd and 4th Amendment— Prior 4th Amendment violation. They closed from that. Right. Yes, sir. There were two warrants involved. Yes, sir. The first part, there was no warrant. Right. Thank you, Your Honor. Thank you. And you stay a few minutes for rebuttal. And Mr. Green? Good morning, Your Honors. My name is Graham Green. I represent the United States. As this court has, I think, addressed in its questioning, the question here is the reasonableness of the police conduct when they arrive on the scene. A number of factors that the court is— Have we ever applied the medical emergency to a vehicle-type situation? I'm not aware that we have. All the cases look like they deal with a home, which is a little bit more than that. And that would be— And you wouldn't want to stretch this too far, even if we did agree with you. You wouldn't want to, every time you had a vehicle abandoned, particularly an RV or a camper, you just say, well, somebody's in it, we can go there and take a look at it, because in North Carolina, there's RVs and campers all over the place. Yes, Your Honor. People park them in a lot of different places. Sam's Parking Lots and all kinds of things, and it's— Of the two exceptions here, which one would you view to be the stronger argument? I think it is the community caretaking exception, principally because— The impounding of the vehicle, which they don't seem to disagree with the decision upon— Yes, Your Honor. —is the inventory aspect of it. Yes, Your Honor. And that is because— Why do you think that you should prevail on that? I think, given the underpinnings that we find in Caddy and then later in Offerman, the Supreme Court at least recognizes that the police are going to find themselves in not exactly this situation, but a myriad of circumstances in which we're going to interact with the public and automobiles. And in this particular circumstance, you did have the bank, the community, requesting assistance. The police arrive on the scene, and again, the bank is saying, we need your assistance with this vehicle. I think principally— And that request kind of grows over time, or maybe even insistence, because as the police start to see in plain view these items, which the court has noted— AR-15 weapons, ammunition, tannerite in plain view in the vehicle— they're asking the police to please assist them in towing this vehicle off. And I think that squarely falls within the heart of the community. When you say plain view, you mean someone just walking by it can just glance over and see it, or you have to walk up to the window, put your hands up there and take a look in it? What's the plain view? How plain is the view, I should say? That's a good question. I know they did walk up to the vehicle to examine it, and they saw the AR. They also could see other things like a hotel receipt that was blocked by some other papers. So they certainly took a look in the vehicle pretty closely. The AR-15 was leaning against the front seat, wasn't it? It was, Your Honor, and there's a photograph of it. They noted, I think, in the record that where it was parked was near a sidewalk, and then near another area where people walked. Counsel, do you have the option of— Isn't the medical emergency doctrine or finding required to get enough information to do the inventory search, or is it your position that we could go down either route? I think you could go down on either route, and certainly the district court judge found on both bases— It comes to the same result, your position is. You get the same place, whatever you call it, whatever label you put on it. But didn't the district court— Maybe you know the record better than me. It looked to me like he almost went in a two-step analysis. One, the circumstances that allowed officers to reasonably open the back of the van, and then at that point there were circumstances that justified the inventory search. Now, I think it's fair. Maybe what they saw before they opened the van was enough to do an impoundment and inventory search, and that may be an alternative way. But didn't he kind of go at it in a two-step process, or you think I'm reading that wrong? I think, to be fair, as we read the record, he talked about both processes, but said he found it reasonable based on both theories. The court certainly extrapolated more on the community caretaking in its order than it did on the urgent necessity, but certainly the court spoke more about the community caretaking. Again, these circumstances also— And I think, Judge Winn, you asked this question, don't we have to worry about how far we go? This case was notable, as the district court found, and as Captain Smith from the Kannapolis PD testified to, he had never seen anything like this in 20 years' experience. So this was a very unique circumstance. It was not basically recreational vehicles in the Walmart parking lot. This was a circumstance in which they arrive on the scene, they see all these things, these indications, the California tag, a suitcase in the front, and I think Officer Lambert testified that he had had experience that people who were traveling or living out of their cars would have a suitcase with them, and they see this scene, and if the court does credit the findings of the district court, the door was ajar, and they noticed it, and that's certainly a very reasonable conclusion. I have this vehicle. I have what are obviously valuable things in the front. I have what is a suitcase, which would indicate you're going to be maybe living with or traveling in this vehicle, and then I see a door ajar. That is a completely reasonable conclusion that somebody is possibly inside the van. Now, notably, the police don't try, and in the record below, and I think that ultimately leads the district court to conclude that they're credible, is they don't try and say, you know, we knew for sure that there was going to be someone in the van. They don't. They just, as they're on the scene, as they start to develop the circumstance, as they start to think about it, they even are calling a supervisor, and a supervisor, after hearing those same facts, said you better check to make sure there's nobody back there, and that's what they did. We don't have, in terms of this reasonable analysis, we don't have a headlong rush by the police when they get there. Ultimately, the call from the record is about two vehicles. They're performing a community caretaking exception. The bank says, can you help us? We're trying to determine whose the vehicles are. Maybe it's a customer. Obviously, they don't want to tow a customer's car, and as they start this process, it's a slow, and the judge below thought about it, it's a slow, meticulous process as they go through this circumstance. Further, the police also are, in fact, confined reasonably by their policies, because, as the record indicates, they are carefully considering, can we do this, and having conversations with the bank, and ultimately, after a supervisor with more experience consults with someone, they determine that, yes, our policy would allow you to do that, as it relates to towing the vehicle. What's your thought on the fact that the policies, say, refer to the zoning administrator, if you're going to tow a vehicle off private property? I know the testimony is that the zoning administrator would have, from their experience, involved the police necessarily in a situation where there are guns like this, but, you know, is that, A, is it a violation of the policy, or that we should overlook because of overall reasonableness, or do you say that it actually complied with the policy? We think it certainly complied with the policy. Can you explain why that is? If you look at the, kind of the preamble to the Kannapolis ordinance in which the policy is based on, and I think it please the court that, was government's exhibit number 14, there's a provision when it starts talking about it, it says that as they're explaining this kind of division of labor, who's got the junk cars, who's got the abandoned cars, etc., it talks about nothing in the ordinance is designed to limit the police in exercising their power, and so it is certainly, we think, police came to a reasonable conclusion, and even within the, The decision, the ultimate decision was made by the police chief, wasn't it? No, the ultimate decision was made by Captain Smith in consultation with a, Captain Smith, he wasn't the police chief. He was not. What was he? That's what I'm talking about. That's the one I, Yes, sir. Captain Smith was head over, I think, an administrative division, which included, he listed, They had a captain on the scene. Yes, your honor, and he consulted with a higher, a higher person within the police chain before he reached that conclusion, and so ultimately the court found that the policy was reasonable, that they, in good faith, followed their policy, and the government says, unequivocally, that we believe that the policy allowed them to make this decision, and then furthermore, as the court has said, the standard here is reasonableness, even if the court says, well, there's a technical violation that one step extra wasn't followed, we don't believe this court should find that to be, per se, unreasonable. What about that inventory issue? I always thought if they, if the policemen take custody of something, they're obliged to inventory. They get burned, I know, at trial, when they don't. I mean, I had some experiences when, I was a prosecutor, of the inventories being insufficient, and they, you know, we complain about it, and have to have hearings about it, and all that kind of stuff, because they claimed there was stuff there that wasn't designated and everything. The inventories weren't good enough. I thought they were going to take custody of a car, they had the inventory of what was in it. Your Honor, I think that- And here, well, actually, when they got into the thing, they found $500,000 in cash. They did. So I, I thought the claim about what that was, surprised by it. Your Honor, and I think that that is, the police indicated, and it's interesting, you kind of have three separate audiences here for this community caretaking function, as kind of brought out at the hearing. One is the bank. The bank is asking for help. We've got a vehicle out here in our parking lot with a gun, and a bunch of other stuff that's concerning. Can you help us determine who the owner is? Secondly, of course, although this ultimately ended up turning out poorly for Mr. Treisman, there's testimony in the record from the police on scene that one of the reasons we want to do this inventory is to protect whomever, who we cannot find who it is, owns these things. And they were valuable things. Certainly, someone who had, for whatever reason, left $500,000 nearly in an unlocked vehicle in a bank parking lot, that would be a good community caretaking function that we're helping... Counsel, what's the... Mr. Treisman's counsel points out that the officers not just called out the serial numbers, but ran the serial numbers. What's that have to do with either inventory search, or, I guess that's what it is there, in securing the property? They say that's evidence that you're actually investigating a crime. Well, certainly the district court heard that and didn't think, on balance, that tip the scales to make it subterfuge. But secondly, I think it was... I think it was Captain Smith testified that once we take possession of a thing in an inventory, especially weapons, we run the serial numbers to determine are they stolen. So if someone shows back up at the police department and says, you know, you towed my car, I want the gun back... The testimony is that's part of the custom and procedures of an inventory search, that you would run serial numbers on weapons? It was for the Kannapolis Police Department. And further, they also indicated, obviously, the police have a legitimate concern in making sure they're not returning a weapon to a prohibited person. So trying to establish who the owner is, taking down the serial numbers. But the court heard, obviously, and that was elucidated and weighed specifically by the court in its consideration and did not tip the balance. The court has no further questions. Thank you very much, Mr. Green. Thank you. Good to have you with us. Mr. Blau? Thank you, Your Honors. And as I've noted in the briefs, I don't think this court even needs to address the impound and inventory ultimately because the first entry into the van and everything that flows from that has to deal with whether or not there's actually a reasonable belief that there's a medical emergency here. And we have to remember, we have two officers on the scene for 90 minutes who testified that they didn't think at all that there was or they had no reason to think that there was someone in the van or that there was an emergency that required them to enter immediately to render aid. It wasn't until an hour and a half after being on the scene on a conversation with another officer who wasn't even there where that other officer said, well, it's a hot day. Someone's probably in the back of that van. That's an urgent necessity and you need to go in there to look. And then even if that decision's made, they still don't knock or call out or do anything. They open the van, draw guns, start moving some boxes around before they do anything else. When did your client eventually show up? How much longer after the police were there and conducted their search? It's later that afternoon. I don't think we know exactly when the van gets towed away, but I believe Mr. Treisman showed up within an hour or two after that. It was later that afternoon. Was that about noon or something when it got towed away? Well, no, I think that the first officer, I believe, arrived sometime around 10.50 to 11 o'clock. Then the first entry into the van, I think, was around 12.30 p.m. It was sometime after that that it was removed because they did the inventory. It seemed to have taken at least an hour. Of course, the inventory was done before they impounded the van. And Mr. Treisman, it may have been around 3 o'clock that afternoon. I can't recall exactly, Your Honor. But it was within a fairly short period of time. And as I noted in the briefs, I think that if the police had followed their proper procedure and contacted the city's zoning administrator to see what they wanted to do and whether they would approve not only impounding the van, but also waiving the seven-day notice requirements, that probably by the time that would have happened, Mr. Treisman shows back up and none of this has happened. The fact that they bypassed another government office who was responsible for the decision-making and they just said, no, we're going to make it on their own and we're going to cut you out of this process entirely, shows that, or is it just one of the factors that would show that they had a motivation of looking for evidence of crime in what they were doing? Is that your best argument? That the wrong person made the decision? Well, that's just one factor that this court has instructed courts to consider to determine whether there's evidence of pretext. If the police have... That's not really... Is that right? I mean, I guess the question is, are they in lawful possession? But, I mean, the question about procedures is really under the inventory search. Well, right. And I get the argument that that's relevant in terms of whether they had lawful possession. Sure. But the case law that talks about following procedures really is not in that aspect of it. It's in the inventory search part of it. I know there's some connection there, and maybe that's Harris's belief. If you look, I think your Honor is right, but if you look, and I realize I'm taking us out of the context of federal court, but the North Carolina case, Fifer from the North Carolina Supreme Court, deals with almost exactly the same situation where officers are supposed to get approval from a particular person before they do an impound. Not an inventory, but an impound, and they don't do it. It doesn't even... I mean, the policy is a little less than inviting. It should be referred to the zoning administrator. It doesn't say shall be. It doesn't say can only be approved by. As I recall, it said should be referred. And, you know, that's less, if I'm reading that right or remember that right, that's less than absolute, and they know that the zoning administrator always says, y'all got to be the ones when there's guns there. Right, and what the ordinance does do, if I could just answer your first question, what the ordinance does do is it directs that that decision and the decision to waive the required seven days notice is supposed to be made by the authorizing official, which is the city zoning administrator under the code and the police orders. Thank you very much, your honors. If you have no more questions. Thank you, Mr. Blau. We appreciate your work. Thank you, your honor. And we'll come down and greet counsel, and then we'll return to the bench and call this next case.
judges: Robert B. King, James Andrew Wynn, A. Marvin Quattlebaum Jr.